## CALIFORNIA *v.* NEVADA

No. 73, Orig.   Argued April 14, 1980—Decided June 10, 1980

BRENNAN, J., delivered the opinion for a unanimous Court.

*James H. Thompson,* Special Deputy Attorney General of Nevada, argued the cause for defendant. With him on the brief were *Richard H. Bryan,* Attorney General, *Larry D. Struve,* Chief Deputy Attorney General, and *Harry W. Swainston,* Deputy Attorney General.

*Jan S. Stevens,* Assistant Attorney General of California, argued the cause for plaintiff. With him on the briefs were *George Deukmejian,* Attorney General, and *N. Gregory Taylor,* Assistant Attorney General.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The report of the Special Master tenders for the Court's approval his determination of the true boundary between the States of California and Nevada. That boundary was the subject of numerous surveys in the latter half of the 19th century, and the central question presented in this original action is which, if any, of the lines which resulted properly marks the rugged border between the two States.[1] The Special Master combed the voluminous record and concluded that in combination the two most recent surveys had fixed a boundary to which both States have acquiesced for the better part of a century. Applying the doctrine of prescription and acquiescence, he concluded that the boundary so fixed was the proper one. Nevada takes exception to that determination on several grounds. We overrule those exceptions and, with the qualifications hereinafter noted, approve and adopt the Special Master's report.

---

*Solicitor General McCree* and *Deputy Solicitor General Claiborne* filed a memorandum for the United States as *amicus curiae.*

[1] California instituted this original action on April 22, 1977, when it filed its motion for leave to file complaint and complaint. On June 29, 1977, we granted that motion and appointed the Special Master. Basically, California sought a declaration that the currently recognized line dividing the two States was in fact the lawful boundary. As counsel for the State characterized it at oral argument, the suit was in the nature of a quiet title action and was precipitated by growing doubts about the geographic accuracy of the existing line as well as concerns regarding the validity of certain titles which depended upon the location of the border. The Special Master's report was filed in this Court on October 29, 1979, 444 U. S. 922, and we set Nevada's exceptions and related matters for oral argument. 444 U. S. 1065 (1980).

# I

The two straight-line segments that make up the boundary between California and Nevada were initially defined in California's Constitution of 1849. The first, the "north-south" segment, commences on the Oregon border at the intersection of the 42d parallel and the 120th meridian and runs south along that meridian to the 39th parallel. And the second, the "oblique" segment, begins at that parallel and runs in a southeasterly direction to the point where the Colorado River crosses the 35th parallel. Cal. Const., Art. XII (1849). In 1850, when California was admitted to the Union, Congress approved the 1849 Constitution, and with it California's eastern boundary. Act of Sept. 9, 1850, 9 Stat. 452.

On the same day that it admitted California, Congress established a territorial government in the area immediately to the east. The organic Act for that new Territory—which was then called Utah—stated that it was to be "bounded on the west by the State of California." Act of Sept. 9, 1850, 9 Stat. 453. Eleven years later, the Territory of Nevada was created out of Utah. Congress indicated in the organic Act that Nevada might include portions of what was then California, but with the proviso that "so much of the Territory within the present limits of the State of California shall not be included within this Territory until the State of California shall assent to the same by an act irrevocable without the consent of the United States. . . ." Act of Mar. 2, 1861, 12 Stat. 210. No assent was ever given by California. Accordingly, when Nevada was admitted as a State in 1864 its western boundary and California's eastern one remained congruent.[2]

---

[2] Nevada's Constitution stated that its boundary would proceed "in a North Westerly direction along [the oblique section of the] Eastern boundary line of the State of California to the forty third degree of Longitude West from Washington [and then] North along said forty third degree of West Longitude, and said Eastern boundary line of the State of California

Notwithstanding brief and incomplete surveying efforts in the decade after California was admitted, the actual location on the ground of that State's eastern boundary remained highly uncertain—so much so that fighting broke out over the precise whereabouts of a small valley on the north-south line above Lake Tahoe, and a border town along the oblique line found itself claimed as the seat of both a Nevada and a California county.[3] These difficulties led California and Nevada to commission a joint survey of their border. Conducted in 1863, that survey located what is known as the Houghton-Ives line from the Oregon border south along the 120th meridian to a point in Lake Tahoe and then southeast for about 103 miles along the oblique line in the direction of the relevant point on the Colorado River. The remaining 300-plus miles of the oblique border were not surveyed.[4]

Both California and Nevada adopted the Houghton-Ives line by statute, but its significance was to be short-lived. In 1867–1868 Daniel G. Major surveyed the Oregon-California boundary for the General Land Office. One step in his work was to locate the intersection of that boundary and the 120th meridian. This he did, at a point more than two miles west

to the forty second degree of North Latitude. . . ." Nev. Const., Art. XIV, § 1 (1864). Although it turns out that the 43d degree of longitude west from Washington does not exactly coincide with the 120th meridian west of Greenwich—which was the north-south reference in the California Constitution—the Special Master concluded that the Congress that approved Nevada's Constitution was of the view that the two lines were identical. Certainly the language of the Nevada Constitution supports this conclusion by seeming to equate the 43d degree of longitude west of Washington with the eastern boundary of California. In any event, we need not explore the matter further since it would be relevant only were we to require a new survey of one or the other longitudinal line, and we do not find such a new survey necessary.

    [3] Indeed, the town—Aurora—elected representatives to both the California and Nevada Legislatures in 1862, and those representatives apparently became speakers of their respective legislatures.

    [4] Two years later one James S. Lawson extended the oblique portion of the Houghton-Ives line another 73 miles.

of that meridian as marked by Houghton-Ives. This discrepancy [5] eventually led the Commissioner of the General Land Office to recommend that Congress appropriate money for a full survey of the eastern boundary of California. His recommendation was followed in 1872.

The new survey was conducted by Allexey W. Von Schmidt. While originally instructed to commence his north-south line at the point located by Daniel G. Major, Von Schmidt concluded that the actual 120th meridian lay not only east of "Major's corner," but six-tenths of a mile east of the Houghton-Ives line as well. Accordingly, Von Schmidt marked a new north-south line starting at this location. His survey of the oblique boundary also had its surprises. From the intersection of his north-south segment and the 39th parallel he set off in what he thought was the direction of the intersection of the Colorado River and the 35th parallel. Unfortunately, the Colorado River had shifted since the point for which he was aiming had been marked, and rather than end at the wrong place he attempted to correct the line he was marking. It later turned out that his corrections were not complete and his line not entirely straight. But linear or not, his work did generate a boundary. And, although neither State adopted it by statute, the Von Schmidt survey won gradual acceptance in both California and Nevada.

In the 1880's, however, substantial doubts about the accuracy of the oblique segment of the Von Schmidt line were voiced in Washington. As a result, Congress appropriated funds in 1892 for a new survey of that segment. The survey was undertaken by personnel of the United States Coast and Geodetic Survey and conducted over a period of several years. It yielded a new oblique line and determined that the one charted by Von Schmidt had been neither straight nor accu-

---

[5] A third survey, conducted in the summer of 1872 near the Oregon border, contributed to the confusion by concluding that the 120th meridian lay to the east of the locations pinpointed by both Major and Houghton-Ives.

rate. Both States adopted the United States Coast and Geodetic Survey line by statute—California in 1901 and Nevada in 1903.[6]

The Special Master concluded that the Von Schmidt survey of the north-south line and the United States Coast and Geodetic Survey one of the oblique line were the most recent and accurate surveys available. While noting that Von Schmidt had not been entirely accurate, the Master found that the north-south line that resulted from his survey had been consistently and routinely recognized and accepted by agencies and departments of the State of Nevada for more than a century. That the Houghton-Ives line was the first north-south boundary marked and the only one approved by statute was, he found, beside the point because as a practical matter that boundary had been superseded a decade after it was established and neither State had objected.[7] As for the oblique boundary, the Master found that the United States Coast and Geodetic Survey line had not only been adopted by statute, but also been accepted and used by the two States for nearly 80 years. Since both States had treated these lines as the boundary from the time they were drawn, the Master invoked the doctrine of acquiescence to determine that together they in fact constitute the true and correct interstate boundary.

## II

The State of Nevada's primary contention is that the Special Master's reliance upon the doctrine of acquiescence was

---

[6] Nevada's statute was in effect when the present litigation was commenced, although it has subsequently been repealed.

[7] California notes that Nevada welcomed the Von Schmidt survey at the time it was conducted. Indeed, the Surveyor General of that State remarked that "within a year the State will be inclosed by an actual surveyed line and monuments, and the troubles heretofore existing, to State and county officials, in dealing with an imaginary line, will be entirely and forever obviated." Report of the Surveyor General and State Land Register of the State of Nevada for the years 1871 and 1872, p. 8.

in error. Basically, the argument is that once Nevada and California had conducted the 1863 joint survey which produced the Houghton-Ives line the Federal Government had no constitutional authority to mark a different line which had the effect of removing territory from one State and granting it to the other. Since the Congress was without power to determine the Von Schmidt and United States Coast and Geodetic Survey lines, the argument continues, they are without legal effect. And because States may not confer upon the Federal Government a power which the Constitution does not vest in it, acquiescence in those lines cannot make them lawful. Thus, Nevada concludes, either (1) Congress is constitutionally empowered to redraw the boundaries of the several States, in which case the Von Schmidt and Geodetic Survey lines may be upheld regardless of acquiescence, or (2) Congress is constitutionally powerless to alter those boundaries, in which case no mere century of acquiescence can convert a usurpation into law.

The flaw in this argument is that it assumes that there must be a particular relationship between the *origins* of a boundary and the legal *consequences* of acquiescence in that boundary. In fact, however, no such relationship need exist. Longstanding acquiescence by California and Nevada can give the Von Schmidt and Geodetic Survey lines the force of law whether or not federal authorities had the power to draw them. And the determination that the two States' conduct has had precisely this effect, therefore, does not place any sort of constitutional imprimatur upon the federal actions involved. See *Ohio* v. *Kentucky,* 410 U. S. 641, 648–651 (1973); *Indiana* v. *Kentucky,* 136 U. S. 479, 509–510 (1890). Accordingly, we need not address the issue of federal power to which Nevada adverts. It is enough that California claims and has always claimed all territory up to a specifically described boundary—the 120th meridan and the oblique line with which it connects—and that both States have long ac-

quiesced in particular lines marking that boundary.[8]   If Nevada felt that those lines were inaccurate and operated to deprive it of territory lawfully within its jurisdiction the time to object was when the surveys were conducted, not a century later.   *Ohio* v. *Kentucky, supra,* at 649.   In consequence, we hold that in these circumstances the Special Master was fully justified in invoking the doctrine of acquiescence.[9]

## III

Having determined that the Special Master's resolution of the boundary dispute was proper, we turn to his recommendations regarding the quite separate issue of ownership of various

---

[8] Nor is Nevada's position saved by the contention that California could not profit by the doctrine of acquiescence because its claim to the lands up to the Von Schmidt and United States Coast and Geodetic Survey lands was not made under color of title or claim of right.   The fact is that California's claim has always been for all lands on its side of the boundary described rather specifically in its Constitution.   So long as its claims were made under a survey that purported to reflect that boundary, it had colorable title and a claim of right.

[9] Several subsidiary issues relating to the California-Nevada border are considered in the Special Master's recommendations.   First, it turns out that Von Schmidt's north-south line and the United States Coast and Geodetic Survey oblique line do not intersect at precisely the 39th parallel, as in theory they should.   The Special Master suggests that the two States be given the opportunity to determine by agreement the point in Lake Tahoe where the two lines meet.   Failing such an accord, he indicates that he would recommend a solution; but this probably will not be necessary since the parties are apparently in agreement that if the balance of the Master's report is accepted the best course is to extend the oblique line in a northwesterly direction to the point where it crosses the north-south line.   This solution to the problem is entirely permissible.   Cf. *New Hampshire* v. *Maine,* 426 U. S. 363 (1976).   Second, the Master recommends that he be authorized to arrange for surveys, at the parties' expense, if necessary to resolve disputes over the precise location of portions of either of the lines we approve today.   That, too, seems appropriate.   And third, he states that we should reserve the taxing of costs until after a further report—a suggestion which we will follow since the possibility of partial surveys would make an assessment at this time premature.

disputed borderlands. This matter is here on California's motion to file a second amended complaint and bifurcate issues, which seeks further proceedings before the Special Master after the boundary questions are determined. Specifically, the United States has apparently confirmed or "clear-listed" to California and Nevada certain parcels that turn out to be on the "wrong" side of the boundary between those States. The Special Master was of the view that California's motion should be allowed and that he should be authorized (1) to determine whether the United States should be made a party to this case and (2) to make recommendations as to the quieting of title on various borderlands.

We decline at this point to expand the Special Master's reference. The ownership and title questions that remain typically will involve only one or the other State and the United States, or perhaps various citizens of those States. Disputes between California and Nevada are not in the offing.[10]  In consequence, even if some of the ownership questions to come do fall within our original jurisdiction, they will not fall within our exclusive jurisdiction. 28 U. S. C. § 1251 (1976 ed., Supp. II). Under these circumstances we see no reason to refer the matter to the Special Master. On the contrary, litigation in other forums seems an entirely appropriate means of resolving whatever questions remain.

In sum, we overrule Nevada's exceptions and approve and adopt the Special Master's report and recommendations except insofar as those recommendations would allow California's second amended complaint and permit proceedings relating to the ownership of disputed lands on the California-Nevada boundary.

*So ordered.*

---

[10] At oral argument, counsel for the State of California conceded that he knew of no instance in which both States claimed the same parcel.