## NEBRASKA *v.* WYOMING ET AL.

No. 108, Orig.   Argued March 21, 1995—Decided May 30, 1995

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, KENNEDY, GINSBURG, and BREYER, JJ., joined, and in Parts I, II, and III of which THOMAS, J., joined. THOMAS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 23.

*Richard A. Simms*, Special Assistant Attorney General of Nebraska, argued the cause for plaintiff. With him on the briefs were *Don Stenberg*, Attorney General, *Marie C. Pawol*, Assistant Attorney General, *James C. Brockmann*, and *Jay F. Stein*.

*Dennis C. Cook*, Special Assistant Attorney General, argued the cause for defendant State of Wyoming. With him on the briefs were *Joseph B. Meyer*, Attorney General, *Larry Donovan*, Senior Assistant Attorney General, *Donald*

*M. Gerstein,* Assistant Attorney General, and *Raphael J. Moses* and *James R. Montgomery,* Special Assistant Attorneys General. *Timothy M. Tymkovich,* Solicitor General, argued the cause for defendant State of Colorado. With him on the brief were *Gale A. Norton,* Attorney General, *Stephen K. Erkenbrack,* Chief Deputy Attorney General, and *Wendy C. Weiss,* First Assistant Attorney General.

*Jeffrey P. Minear* argued the cause for the United States. With him on the briefs were *Solicitor General Days, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, Andrew F. Walch,* and *Patricia L. Weiss.*\*

JUSTICE SOUTER delivered the opinion of the Court.

Since 1945, a decree of this Court has rationed the North Platte River among users in Wyoming, Nebraska, and Colorado. By petition in 1986, Nebraska again brought the matter before us, and we appointed a Special Master to conduct the appropriate proceedings. In his Third Interim Report on Motions to Amend Pleadings (Sept. 9, 1994) (hereinafter Third Interim Report), the Master has made recommendations for rulings on requests for leave to amend filed by Nebraska and Wyoming. We now have before us the parties' exceptions to the Master's report, each of which we overrule.

I

The North Platte River is a nonnavigable stream rising in northern Colorado and flowing through Wyoming into Nebraska, where it joins with the South Platte to form the Platte River. In 1934, Nebraska invoked our original jurisdiction under the Constitution, Art. III, § 2, cl. 2, by suing Wyoming for an equitable apportionment of the North Platte. The United States had leave to intervene, Colorado was impleaded as a defendant, and the ensuing litigation cul-

---

\*Briefs of *amici curiae* were filed for the Basin Electric Power Cooperative by *Edward Weinberg, Richmond F. Allan, Michael J. Hinman,* and *Claire Olson;* and for the Platte River Trust by *Abbe David Lowell.*

minated in the decision and decree in *Nebraska* v. *Wyoming*, 325 U. S. 589 (1945) *(Nebraska I)*.

We concluded that the doctrine of prior appropriation should serve as the general "guiding principle" in our allocation of the North Platte's flows, *id.*, at 618, but resisted an inflexible application of that doctrine in rendering four principal rulings. *Ibid.* First, we enjoined Colorado and Wyoming from diverting or storing water above prescribed amounts, meant to reflect existing uses, on the river's upper reaches. *Id.*, at 621–625, 665–666. Second, we set priorities among Wyoming canals that divert water for the use of Nebraska irrigators and federal reservoirs, also in Wyoming, that store water for Wyoming and Nebraska irrigation districts. *Id.*, at 625–637, 666–667. Third, we apportioned the natural irrigation-season flows in a stretch of river that proved to be the principal focus of the litigation (the "pivotal reach" of 41 miles between the Guernsey Dam in Wyoming and the Tri-State Dam in Nebraska), allocating 75 percent of those flows to Nebraska and 25 percent to Wyoming. *Id.*, at 637–654, 667–669. Finally, we held that any party could apply for amendment of the decree or for further relief. *Id.*, at 671 (Decree Paragraph XIII). With the parties' stipulation, the decree has since been modified once, to account for the construction of the Glendo Dam and Reservoir. *Nebraska* v. *Wyoming*, 345 U. S. 981 (1953).

Nebraska returned to this Court in 1986 seeking additional relief under the decree, alleging that Wyoming was threatening its equitable apportionment, primarily by planning water projects on tributaries that have historically added significant flows to the pivotal reach. We granted Nebraska leave to file its petition, 479 U. S. 1051 (1987), and allowed Wyoming to file a counterclaim, 481 U. S. 1011 (1987).

Soon thereafter, Wyoming made a global motion for summary judgment, which the Master in his First Interim Report recommended be denied. See First Interim Report of Special Master, O. T. 1988, No. 108 Orig. After engaging

in discovery, Nebraska, Wyoming, Colorado, and the United States all filed further summary judgment motions. In his Second Interim Report, the Master recommended that we grant the motions of the United States and Nebraska in part, but that we otherwise deny summary relief. See Second Interim Report of Special Master on Motions for Summary Judgment and Renewed Motions for Intervention, O. T. 1991, No. 108 Orig. We overruled the parties' exceptions. *Nebraska* v. *Wyoming*, 507 U. S. 584 (1993) *(Nebraska II)*.

Nebraska and Wyoming then sought leave to amend their pleadings, and we referred those requests to the Master. The Amended Petition that Nebraska seeks to file contains four counts. Count I alleges that Wyoming is depleting the natural flows of the North Platte and asks for an injunction against constructing storage capacity on the river's tributaries and "permitting unlimited depletion of groundwater that is hydrologically connected to the North Platte River and its tributaries." App. to Third Interim Report D–2 to D–7. Count II alleges that the United States is operating the Glendo Reservoir in violation of the decree and seeks an order holding the United States to the decree. *Id.*, at D–7 to D–8. Count III alleges that Wyoming water projects and groundwater development threaten to deplete the Laramie River's contributions to the North Platte, and asks the Court to "specify that the inflows of the Laramie River below Wheatland are a component of the equitable apportionment of the natural flows in the [pivotal] reach, 75% to Nebraska and 25% to Wyoming, and [to] enjoin the State of Wyoming from depleting Nebraska's equitable share of the Laramie River's contribution to the North Platte River . . . ." *Id.*, at D–8 to D–12. Count IV seeks an equitable apportionment of the North Platte's nonirrigation season flows. *Id.*, at D–12 to D–16. The Master recommended that we allow Nebraska to substitute the first three counts of its Amended Petition for its current petition, but that we deny leave to file Count IV. Neither Nebraska nor the United States has

excepted to the Master's recommendation, whereas Wyoming has filed three exceptions, set out in detail below.

Wyoming proposes to amend its pleading with four counterclaims and five cross-claims. The First Counterclaim and Cross-Claim allege that Nebraska and the United States have failed to recognize beneficial use limitations on diversions by Nebraska canals, and that Nebraska (with the acquiescence of the United States) has violated the equitable apportionment by demanding natural flow and storage water from sources above Tri-State Dam and diverting them for use below Tri-State Dam. App. to Third Interim Report E–3 to E–6, E–8 to E–10. Wyoming's Second and Third Counterclaims and Cross-Claims seek enforcement or modification of Paragraph XVII of the decree, which deals with the operation of the Glendo Reservoir and is also the subject of Count II of Nebraska's Amended Petition. *Id.*, at E–6 to E–7, E–10 to E–11. By its Fourth Counterclaim and Fifth Cross-Claim, Wyoming asks the Court to modify the decree to leave the determination of carriage (or transportation) losses to state officials under state law. *Id.*, at E–7 to E–8, E–12. Finally, Wyoming's Fourth Cross-Claim alleges that the United States has failed to operate its storage reservoirs in accordance with federal and state law and its own storage water contracts, thus upsetting the very basis of the decree's equitable apportionment. *Id.*, at E–11 to E–12.

The Master recommended that we allow Wyoming to substitute its Second through Fourth Counterclaims and its Second through Fifth Cross-Claims for its current pleadings, but that we deny leave to file Wyoming's First Counterclaim and Cross-Claim insofar as they seek to impose a beneficial use limitation on Nebraska's diversions of natural flow. The United States and Nebraska except to the recommendation to allow Wyoming to file its Fourth Cross-Claim. Wyoming excepts to the Master's recommended disposition of its First Counterclaim and Cross-Claim. In all, then, Wyoming has filed four exceptions to the Master's recommendations and

the United States and Nebraska a single (and largely over-lapping) exception each.

## II

We have found that the solicitude for liberal amendment of pleadings animating the Federal Rules of Civil Procedure, Rule 15(a); *Foman* v. *Davis*, 371 U. S. 178, 182 (1962), does not suit cases within this Court's original jurisdiction. *Ohio* v. *Kentucky*, 410 U. S. 641, 644 (1973); cf. this Court's Rule 17.2. The need for a less complaisant standard follows from our traditional reluctance to exercise original jurisdiction in any but the most serious of circumstances, even where, as in cases between two or more States, our jurisdiction is exclusive. *Mississippi* v. *Louisiana*, 506 U. S. 73, 77 (1992) ("'The model case for invocation of this Court's original jurisdiction is a dispute between States of such seriousness that it would amount to *casus belli* if the States were fully sovereign,'" quoting *Texas* v. *New Mexico*, 462 U. S. 554, 571, n. 18 (1983)); *New York* v. *New Jersey*, 256 U. S. 296, 309 (1921) ("Before this court can be moved to exercise its extraordinary power under the Constitution to control the conduct of one State at the suit of another, the threatened invasion of rights must be of serious magnitude and it must be established by clear and convincing evidence"). Our requirement that leave be obtained before a complaint may be filed in an original action, see this Court's Rule 17.3, serves an important gatekeeping function, and proposed pleading amendments must be scrutinized closely in the first instance to see whether they would take the litigation beyond what we reasonably anticipated when we granted leave to file the initial pleadings. See *Ohio* v. *Kentucky, supra,* at 644.

Accordingly, an understanding of the scope of this litigation as envisioned under the initial pleadings is the critical first step in our consideration of the motions to amend. We have, in fact, already discussed the breadth of the current litigation at some length in reviewing the Special Master's First and Second Interim Reports, *Nebraska II,* 507 U. S.,

at 590–593, where we concluded that this litigation is not restricted "solely to enforcement of rights determined in the prior proceedings," *id.*, at 592. To the contrary, we observed that in Paragraph XIII of the decree, we had retained jurisdiction "to modify the decree to answer unresolved questions and to accommodate 'change[s] in conditions'—a phrase sufficiently broad to encompass not only changes in water supply, . . . but also new development that threatens a party's interests." *Id.*, at 591, citing *Nebraska I*, 325 U. S., at 620. The parties may therefore not only seek to enforce rights established by the decree, but may also ask for "a reweighing of equities and an injunction declaring new rights and responsibilities . . . ." 507 U. S., at 593. We made it clear, however, that while "Paragraph XIII perhaps eases a [party's] burden of establishing, as an initial matter, that a claim [for modification] is 'of that character and dignity which makes the controversy a justiciable one under our original jurisdiction,'" *ibid.*, quoting *Nebraska I, supra*, at 610, the "[party] still must make a showing of substantial injury to be entitled to relief," 507 U. S., at 593.

We think the Master appreciated these conclusions about the scope of this litigation when he assessed the proposed amendments to pleadings to see whether they sought enforcement of the decree or plausibly alleged a change in conditions sufficient to justify its modification. See Third Interim Report 33–36. The parties, of course, do not wholly agree with us, as they indicate by their exceptions, to which we turn.

### III

#### A

Wyoming's First Amended Counterclaim alleges that "Nebraska has circumvented and violated the equitable apportionment by demanding natural flow water for diversion by irrigation canals at and above Tri-State Dam in excess of the beneficial use requirements of the Nebraska lands entitled to

water from those canals under the Decree . . . ." App. to Third Interim Report E–4. Wyoming's First Amended Cross-Claim alleges that the United States "has circumvented and violated the equitable apportionment, and continues to do so, by operating the federal reservoirs to deliver natural flow water for diversion by Nebraska irrigation canals at and above Tri-State Dam in excess of the beneficial use requirements of the lands entitled to water from those canals under the Decree . . . ." *Id.*, at E–8. The Master recommended that we deny leave to inject these claims into the litigation, concluding that Wyoming's object is to transform the 1945 apportionment from a proportionate sharing of the natural flows in the pivotal reach to a scheme based on the beneficial use requirements of the pivotal reach irrigators. Third Interim Report 55–64. Wyoming excepts to the recommendation, claiming that its amendments do no more than elaborate on the suggestion made in the counterclaim that we allowed it to file in 1987, that Nebraska irrigators are wasting water diverted in the pivotal reach. But there is more to the amendments than that, and we agree with the Master that Wyoming in reality is calling for a fundamental modification of the settled apportionment scheme established in 1945, without alleging a change in conditions that would arguably justify so bold a step.

In *Nebraska II* we rejected any notion that our 1945 decision and decree "impose absolute ceilings on diversions by canals taking in the pivotal reach." 507 U. S., at 602. We found that although the irrigation requirements of the lands served by the canals were calculated in the prior proceedings, those calculations were used to "determin[e] the appropriate apportionment of the pivotal reach, not to impose a cap on the canals' total diversions, either individually or cumulatively." *Ibid.* This was clearly indicated, we observed, by the fact that "Paragraph V of the decree, which sets forth the apportionment, makes no mention of diversion ceilings and expressly states that Nebraska is free to allocate

its share among its canals as it sees fit." *Id.*, at 603, citing *Nebraska I, supra,* at 667.

These conclusions about our 1945 decision and decree expose the true nature of Wyoming's amended claims. Simply put, Wyoming seeks to replace a simple apportionment scheme with one in which Nebraska's share would be capped at the volume of probable beneficial use, presumably to Wyoming's advantage. Wyoming thus seeks nothing less than relitigation of the "main controversy" of the 1945 litigation, the equitable apportionment of irrigation-season flows in the North Platte's pivotal reach. See 325 U. S., at 637–638. Under any circumstance, we would be profoundly reluctant to revisit such a central question supposedly resolved 50 years ago, and there can be no temptation to do so here, in the absence of any allegation of a change in conditions that might warrant reexamining the decree's apportionment scheme. Wyoming's first exception is overruled.[1]

### B

Counts I and III of Nebraska's Amended Petition would have us modify the decree to enjoin proposed developments by Wyoming on the North Platte's tributaries, see App. to Third Interim Report D–4 to D–6, D–9 to D–11, on the the-

---

[1] The Master explicitly noted that his recommendation should not be understood as foreclosing Wyoming from litigating discrete matters captured within its First Amended Counterclaim and the First Amended Cross-Claim that do not involve relitigation of the 1945 decision but rather go to the enforcement of the decree. Third Amended Report 63. Specifically, these matters include Wyoming's claim that Nebraska has circumvented the decree by calling for upstream flows for the use of irrigators diverting water below the Tri-State Dam; Wyoming's claim of waste by pivotal reach irrigators offered as a defense to Nebraska's objections to Wyoming uses upstream; and Wyoming's claim that Nebraska canal calls and natural flow diversions by the United States contravene priorities established in Paragraph IV of the decree. *Id.*, at 63–64. Neither the United States nor Nebraska has objected to the Master's recommendation in this respect.

ory that these will deplete the tributaries' contributions to the mainstem, and hence upset "the equitable balance of the North Platte River established in the Decree," *id.*, at D–5, D–10. Wyoming's second exception takes issue with the Master's stated intention to consider a broad array of downstream interests in passing on Nebraska's claims, and to hear evidence of injury not only to downstream irrigators, but also to wildlife and wildlife habitat. Third Interim Report 14, 17, 19, 26.

Consideration of this evidence, Wyoming argues, would run counter to our denial of two earlier motions to amend filed by Nebraska: its 1988 motion, 485 U. S. 931, by which it expressly sought modification of the decree to make Wyoming and Colorado share the burden of providing instream flows necessary to preserve critical wildlife habitat, and its 1991 motion, see 507 U. S. 1049 (1993), in which it sought an apportionment of nonirrigation-season flows. Wyoming also suggests that allegations of injury to wildlife are as yet purely speculative and would be best left to other forums.

Wyoming's arguments are not persuasive. To assign an affirmative obligation to protect wildlife is one thing; to consider all downstream effects of upstream development when assessing threats to equitable apportionment is quite another. As we have discussed above, *Nebraska II* makes it clear that modification of the decree (as by enjoining developments on tributaries) will follow only upon a "balancing of equities," 507 U. S., at 592, and that Nebraska will have to make a showing of "substantial injury" before we will grant it such relief, *id.*, at 593. There is no warrant for placing entire categories of evidence beyond Nebraska's reach when it attempts to satisfy this burden, which is far from insignificant.

Nor does our resistance to Nebraska's efforts to bring about broad new apportionments (as of nonirrigation-season flows) alter this conclusion. Here, Nebraska seeks only to have us enjoin discrete Wyoming developments. If Ne-

braska is to have a fair opportunity to present its case for our doing so, we do not understand how we can preclude it from setting forth that evidence of environmental injury, or consign it to producing that evidence in some other forum, since this is the only Court in which Nebraska can challenge the Wyoming projects. And as for Wyoming's argument that any proof of environmental injury that Nebraska will present will be highly speculative, the point is urged prematurely. Purely speculative harms will not, of course, carry Nebraska's burden of showing substantial injury, but at this stage we certainly have no basis for judging Nebraska's proof, and no justification for denying Nebraska the chance to prove what it can.

C

Wyoming's third exception is to the Master's recommendation to allow Nebraska to proceed with its challenge to Wyoming's actions on Horse Creek, a tributary that flows into the North Platte below the Tri-State Dam. In Count I of its Amended Petition, Nebraska alleges that Wyoming is "presently violating and threatens to violate" Nebraska's equitable apportionment "by depleting the natural flows of the North Platte River by such projects as . . . reregulating reservoirs and canal linings in the . . . Horse Creek Conservancy District." App. to Third Interim Report D–5. Nebraska asks for an injunction against Wyoming's depletions of the creek.

Wyoming argues that the claim is simply not germane to this case, since Horse Creek feeds into the North Platte below the apportioned reach, the downstream boundary of which is the Tri-State Dam. It is clear, however, that the territorial scope of the case extends downstream of the pivotal reach. In the 1945 decision and decree, we held against apportioning that stretch of river between the Tri-State Dam and Bridgeport, Nebraska, not because it fell outside the geographic confines of the case, but because its needed water was "adequately supplied from return flows and other

local sources." *Nebraska I,* 325 U. S., at 654–655. In so concluding, we had evidence that return flows from Horse Creek provided an average annual contribution of 21,900 acre-feet of water to the North Platte during the irrigation season. Third Interim Report 42.

Now Nebraska alleges that Wyoming's actions threaten serious depletion of these return flows, with consequent injury to its interests in the region below the Tri-State Dam. These allegations describe a change in conditions sufficient, if proven, to warrant the injunctive relief sought, and Nebraska is accordingly entitled to proceed with its claim. Wyoming's third exception is overruled.

### D

In Counts I and III of its Amended Petition, Nebraska alleges that increased groundwater pumping within Wyoming threatens substantial depletion of the natural flow of the river. This allegation is obviously one of a change in conditions posing a threat of significant injury, and Wyoming concedes that "groundwater pumping in Wyoming can and does in fact deplete surface water flows in the North Platte River," Third Interim Report 38. In excepting nevertheless to the Master's recommendation that we allow the claim to go forward, Wyoming raises Nebraska's failure to regulate groundwater pumping within its own borders, which is said to preclude Nebraska as a matter of equity from seeking limitations on pumping within Wyoming.

We fail to see how the mere fact of unregulated pumping within Nebraska can serve to bar Nebraska's claim. Nebraska is the downstream State and claims that Wyoming's pumping hurts it; Wyoming is upstream and has yet to make a showing that Nebraska's pumping hurts it or anyone else. If Wyoming ultimately makes such a showing, it could well affect the relief to which Nebraska is entitled, but that is a question for trial, and does not stop Nebraska from amending its claims at this stage.

Wyoming's reliance on two of this Court's prior original cases is, at best, premature. Both cases were decided after trial, see *Kansas* v. *Colorado*, 206 U. S. 46, 49, 105 (1907); *Missouri* v. *Illinois*, 200 U. S. 496, 518 (1906), and while both recognize that relief on the merits may turn on the equities, 206 U. S., at 104–105, 113–114; 200 U. S., at 522, the application of that principle to Nebraska's claim is not, as we have just stated, obvious at this point. We accordingly accept the Master's recommendation, Third Interim Report 41, and overrule Wyoming's fourth exception.

## IV

Wyoming's Fourth Amended Cross-Claim seeks declaratory and injunctive relief and is aimed against the United States alone, alleging that federal management of reservoirs has contravened state and federal law as well as contracts governing water supply to individual users. Wyoming claims that "the United States has allocated storage water in a manner which (a) upsets the equitable balance on which the apportionment of natural flow was based, (b) results in the allocation of natural flow contrary to the provisions of the Decree . . . , (c) promotes inefficiency and waste of water contrary to federal and state law, (d) violates the contract rights of the North Platte Project Irrigation Districts and violates the provisions of the Warren Act, 43 U. S. C. § 523, . . . and (e) exceeds the limitations in the contracts under the Warren Act." App. to Third Interim Report E–11 to E–12. Wyoming alleges that this mismanagement has made "water shortages . . . more frequen[t] and . . . more severe, thereby causing injury to Wyoming and its water users." *Id.*, at E–12.

The United States and Nebraska except to allowing Wyoming's cross-claim to proceed, for two reasons. They argue, first, that the decree expressly refrained from apportioning storage water, as distinct from natural flow, with the consequence that the violations alleged are not cognizable in an

action brought under the decree. Second, they maintain that any claim turning on the United States's failure to comply with individual contracts for the release of storage water ought to be relegated to an action brought by individual contract holders in a federal district court and that, indeed, just such an action is currently pending in *Goshen Irrigation District* v. *United States,* No. C89–0161–J (D. Wyo., filed June 23, 1989).

The Master addressed both objections. As to the first, he said that "even though the decree did not apportion storage water, it was framed based in part on assumptions about storage water rights and deliveries," and that therefore "Wyoming should have the opportunity to go forward with her claims that the United States has violated the law and contracts rights and that such violations have the effect of undermining Wyoming's apportionment." Third Interim Report 70. The Master found the second point "unpersuasive" because "neither Wyoming nor Nebraska [is a party] to the *[Goshen]* case [brought by the individual contractors], and the federal district court, therefore, does not have jurisdiction to consider whether any violations that may be proven on the part of the United States will have the effect of undermining the 1945 apportionment decree." *Id.,* at 71. We agree with the Master on both counts.

The availability of storage water and its distribution under storage contracts was a predicate to the original apportionment decree. Our 1945 opinion expressly recognized the significance of storage water to the lands irrigated by the pivotal reach, noting that over the prior decade storage water was on average over half of the total supply and that over 90 percent of the irrigated lands had storage rights as well as rights to natural flow. *Nebraska I,* 325 U. S., at 605. We pointed out that Nebraska appropriators in the pivotal reach had "greater storage water rights" than Wyoming appropriators, *id.,* at 645, a fact that helped "tip the scales in

favor of the flat percentage system," as against a scheme even more favorable to Nebraska, *ibid.*

In rejecting Wyoming's original proposal, which was to combine water from storage and natural flow and apportion both by volume among the different users, *id.*, at 621, we anticipated that the storage supply would "be left for distribution in accordance with the contracts which govern it," *id.*, at 631. In doing so, we were clearly aware of the beneficial use limitations that govern federal contracts for storage water. Contracts between the United States and individual water users on the North Platte, we pointed out, had been made and were maintained in compliance with §8 of the Reclamation Act of 1902, 32 Stat. 388, 43 U. S. C. §§372, 383, which provided that " 'the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right.' " 325 U. S., at 613. In addition, contracts had been made under the Warren Act, 36 Stat. 925, 43 U. S. C. §§523–525, which granted the Secretary of the Interior the further power to contract for the storage and delivery of water available in excess of the requirements of any given project managed under the Reclamation Act. See *Nebraska I, supra,* at 631, 639–640.

Under this system, access to water from storage facilities was only possible by a contract for its use, *Nebraska I,* 325 U. S., at 640, and apportionment of storage water would have disrupted that system. "If storage water is not segregated, storage water contractors in times of shortage of the total supply will be deprived of the use of a part of the storage supply for which they pay . . . [and] those who have not contracted for the storage supply will receive at the expense of those who have contracted for it a substantial increment to the natural flow supply which, as we have seen, has been insufficient to go around." *Ibid.* Hence, we refrained from apportioning stored water and went no further than capping

the total amount of storage in certain dams to protect senior, downstream rights to natural flow. *Id.*, at 630. But although our refusal in 1945 to apportion storage water was driven by a respect for the statutory and contractual regime in place at the time, we surely did not dismiss storage water as immaterial to the proper allocation of the natural flow in the pivotal reach. And while our decree expressly protected those with rights to storage water, it did so on the condition that storage water would continue to be distributed "in accordance with . . . lawful contracts . . . ." *Id.*, at 669. This is the very condition that Wyoming now seeks to vindicate.

Wyoming argues that the United States no longer abides by the governing law in administering the storage water contracts. First, it contends that the Government pays no heed to federal law's beneficial use limitations on the disposition of storage water but rather "releas[es] storage water on demand to the canals in the pivotal reach without regard to how the water is used." Brief for Wyoming in Response to Exceptions of Nebraska and United States to Third Interim Report 6 (emphasis deleted) (hereinafter Response Brief). This liberality allegedly harms Wyoming contractees whose storage supply is wasted, as well as junior Wyoming appropriators who are subject to the senior call of the United States to refill the reservoirs and are consequently deprived of the natural flow they would otherwise receive.

Second, Wyoming claims that federal policy in drought years encourages contract users to exploit this failure of the Government to police consumption. It points out that in years of insufficient supply, the United States has calculated each water district's average use of storage water in prior years, and then allocated to each district a certain percentage of that average, according to what the overall supply will bear. The United States has then further reduced the allotment of each individual canal within a district by the

amount of natural flow delivered to the canal, with the result that in dry years water is distributed under "purely a mass [*i. e.*, fixed volume] allocation that sets a cap on the total diversion of each individual canal." *Id.*, at 8. Wyoming thus contends not only that under this system "in a dry year like 1989 the [United States's] allocation effectively replaces the Court decreed 75/25 apportionment," *id.*, at 9, but that the departure from the norm is needlessly great because the system "encourages individual canals to divert as much water as possible during 'non-allocation' years in order to maximize their average diversions which will be the measure of their entitlement in a subsequent dry year allocation," *id.*, at 8, n. 6.

If Wyoming were arguing merely that any administration of storage water that takes account of fluctuations in the natural flow received by a contractee violates the decree, we would reject its claim, for we recognized in 1945 that the outstanding Warren Act contracts contained "agree[ments] to deliver water which will, with all the water to which the land is entitled by appropriation or otherwise, aggregate a stated amount." 325 U. S., at 631. Indeed, we set forth an example of just such a contract in our opinion. *Id.*, at 631, n. 17. In asserting, however, that a predicate to the 1945 decree was that the United States adhered to beneficial use limitations in administering storage water contracts, that it no longer does so, and that this change has caused or permitted significant injury to Wyoming interests, Wyoming has said enough to state a serious claim that ought to be allowed to go forward.[2]

_____

[2] The dissent would disallow Wyoming's cross-claim on the grounds that Wyoming seeks neither to modify the decree (because it asks only for an injunction requiring the United States to adhere to its contracts and to the federal and state law governing storage water) nor to enforce it (since the decree presently contains no such mandate). This leaves Wyoming hanging. It cannot sue under the decree because a mandate of compliance

Although the claim may well require consideration of individual contracts and compliance with the Reclamation and Warren Acts, it does not follow (as Nebraska and the United States argue) that Wyoming is asserting the private contractors' rights proper, or (as the United States contends) that Wyoming brings suit " 'in reality for the benefit of particular individuals,'" Brief for United States in Support of Exception 25, quoting *Oklahoma ex rel. Johnson* v. *Cook,* 304 U. S. 387, 393–394 (1938). Wyoming argues only that the cumulative effect of the United States's failure to adhere to the law governing the contracts undermines the operation of the decree, see Response Brief 14–21, and thereby states a claim arising under the decree itself, one by which it seeks to vindicate its " '*quasi-sovereign*' interests which are 'independent of and behind the titles of its citizens, in all the earth and air within its domain,'" *Oklahoma ex rel. Johnson* v. *Cook, supra,* at 393, quoting *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237 (1907).

It is of no moment that some of the contracts could be made (or are) the subject of litigation between individual contract holders and the United States in federal district court. Wyoming is not a party to any such litigation and, as

is not included in it, yet it cannot seek modification of the decree to include such a mandate, apparently because such relief is not sufficiently drastic. *Post,* at 24–26.

It seems very clear to us, however, that Wyoming is seeking a modification of the decree in order to enforce its predicate. As the dissent concedes, our 1945 decision could conceivably afford a "basis for ordering the United States to comply with applicable riparian law and with its storage contracts . . . ." *Post,* at 25–26. The dissent then rightly points out that such a position would be weak because the decree did not expressly mandate the compliance with lawful contracts and governing law that we anticipated in 1945. *Ibid.* Wyoming's Fourth Cross-Claim, however, now seeks just such a mandate by modifying the decree to require the United States to comply with its own contracts and with the federal and state law governing storage water.

counsel for the United States acknowledged at oral argument, it is uncertain whether the State would qualify for intervention in the ongoing *Goshen* litigation under Federal Rule of Civil Procedure 24. See Tr. of Oral Arg. 46. While the uncertainty of intervention is beside the point on the dissent's view, which "see[s] no reason . . . why Wyoming could not institute its own action against the United States in [district court]," *post*, at 27, the dissent nowhere explains how Wyoming would have standing to bring an action under storage water contracts to which it is not a party. As we have just said, Wyoming's claim derives not from rights under individual contracts but from the decree, and the decree can be modified only by this Court. Putting aside, then, whether another forum might offer relief that, as a practical matter, would mitigate the alleged ill effects of the National Government's contract administration, this is the proper forum for the State's claim, and it makes sense to entertain the claim in the course of adjudicating the broader controversy among Wyoming, Nebraska, and the United States. Cf. *United States* v. *Nevada*, 412 U. S. 534, 537 (1973) *(per curiam)* (denying motion for leave to file bill of complaint in part because "[t]here is now no controversy between the two States with respect to the . . . [r]iver [in question]").

Nor do we fear the specter, raised by the United States, of intervention by many individual storage contractors in this proceeding. Ordinarily, in a suit by one State against another subject to the original jurisdiction of this Court, each State "must be deemed to represent all its citizens." *Kentucky* v. *Indiana*, 281 U. S. 163, 173 (1930). A State is presumed to speak in the best interests of those citizens, and requests to intervene by individual contractees may be treated under the general rule that an individual's motion for leave to intervene in this Court will be denied absent a "showing [of] some compelling interest in his own right,

apart from his interest in a class with all other citizens and creatures of the state, which interest is not properly represented by the state." *New Jersey* v. *New York*, 345 U. S. 369, 373 (1953); cf. Fed. Rule Civ. Proc. 24(a)(2). We have said on many occasions that water disputes among States may be resolved by compact or decree without the participation of individual claimants, who nonetheless are bound by the result reached through representation by their respective States. *Nebraska I*, 325 U. S., at 627, citing *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.*, 304 U. S. 92, 106–108 (1938); see also *Wyoming* v. *Colorado*, 286 U. S. 494, 508–509 (1932). As we view the litigation at the current time, it is unlikely to present occasion for individual storage contract holders to show that their proprietary interests are not adequately represented by their State.

Two caveats are nonetheless in order, despite our allowance of Wyoming's cross-claim. Nebraska argues that Wyoming is using its cross-claim as a back door to achieving the mass allocation of natural flows sought in its First Counterclaim and Cross-Claim. This argument will be difficult to assess without further development of the merits, and we can only emphasize at this point that in allowing Wyoming's Fourth Cross-Claim to go forward, we are not, of course, in any way sanctioning the very modification of the decree that we have just ruled out in this proceeding. Second, the parties should not take our allowance of the Fourth Cross-Claim as an opportunity to enquire into every detail of the United States's administration of storage water contracts. The United States's contractual compliance is not, of itself, an appropriate subject of the Special Master's attention, which is properly confined to the effects of contract administration on the operation of the decree. Contractual compliance, as such, is the subject of the *Goshen* litigation, which we presume will move forward independently of this original action.

## V

For these reasons, the exceptions to the Special Master's Third Interim Report are overruled.

*It is so ordered.*

JUSTICE THOMAS, concurring in part and dissenting in part.

I agree with the decision of the Court to overrule all of Wyoming's exceptions to the Third Interim Report on Motions to Amend Pleading (Report). Accordingly, I join Parts I, II, and III of the Court's opinion. I do not agree, however, that we should overrule the exceptions of the United States and Nebraska to the Master's recommendation that Wyoming be allowed to proceed with its proposed Fourth Cross-Claim against the United States. I would sustain those exceptions and require Wyoming to pursue that claim in another forum.

Wyoming's Fourth Cross-Claim begins with the following allegation:

"The equitable apportionment which the Decree was intended to carry into effect was premised in part on the assumption that the United States would operate the federal reservoirs and deliver storage water in accordance with applicable federal and state law and in accordance with the contracts governing use of water from the federal reservoirs." App. to Report E–11.

Wyoming then alleges generally that "[t]he United States has failed to operate the federal reservoirs in accordance with applicable federal and state laws and has failed to abide by the contracts governing use of water from the federal reservoirs." *Ibid.* According to Wyoming, these failures have "caused water shortages to occur more frequently and to be more severe, thereby causing injury to Wyoming and its water users." *Id.,* at E–12. In short, Wyoming alleges

that "a predicate to the 1945 decree was that the United States adhered to [riparian law's] beneficial use limitations in administering storage water contracts, that it no longer does so, and that this change has caused or permitted significant injury to Wyoming interests." *Ante,* at 19.

In the abstract, these allegations are sufficient to state a claim for modification of the decree based on changed circumstances. Such relief is authorized by the decree's Paragraph XIII, which invited the parties to "apply at the foot of this decree for its amendment or for further relief." *Nebraska* v. *Wyoming,* 325 U. S. 589, 671 (1945) *(Nebraska I).* In particular, subdivision (f) of Paragraph XIII anticipates that we might modify the decree in light of "[a]ny change in conditions making modifications of the decree or the granting of further relief necessary or appropriate." *Id.,* at 672. Thus, in light of the Federal Government's failure to satisfy our expectation that it would comply with applicable riparian law and with its contracts, we might engage in "a reweighing of equities" and accordingly "reope[n]" the 1945 apportionment of the North Platte and modify the decree in Wyoming's favor. *Nebraska* v. *Wyoming,* 507 U. S. 584, 593 (1993) *(Nebraska II).*

If Wyoming's Fourth Cross-Claim against the United States had actually sought such relief, I might agree with the Court's decision to allow the claim to proceed. But the cross-claim's prayer for relief seeks neither a reapportionment of the North Platte nor any other modification of the decree. Instead, it asks the Court "to enjoin the United States' continuing violations of federal and state law and ... to direct the United States to comply with the terms of its contracts." App. to Report E–12. This prayer makes perfect sense: Why seek to modify the decree based on a "change in conditions" if such change could be reversed or annulled by means of injunctive relief grounded in existing law? Indeed, were existing law sufficient to prevent the in-

juries alleged by Wyoming, the State could hardly point to the "considerable justification" necessary for "reopening an apportionment of interstate water rights." *Nebraska II, supra,* at 593.[1]

Yet precisely because the injunctive relief requested by Wyoming arises out of and depends on a body of law that exists independently of the decree, the Court errs in asserting that Wyoming "states a claim arising under the decree itself." *Ante,* at 20. This is so for two reasons. First, a claim that the United States must comply with applicable law and with contracts governed by such law—here, §8 of the Reclamation Act of 1902, 32 Stat. 390, 43 U. S. C. §§ 372, 383, the Warren Act, ch. 141, 36 Stat. 925, 43 U. S. C. §§ 523–525, and other federal and state riparian law, see *ante,* at 17—necessarily "arises under" that body of law. See, *e. g., Franchise Tax Bd. of Cal.* v. *Construction Laborers Vacation Trust for Southern Cal.,* 463 U. S. 1, 8–9 (1983) (approving, as a principle of inclusion, "Justice Holmes' statement, 'A suit arises under the law that creates the cause of action'" (quoting *American Well Works Co.* v. *Layne & Bowler Co.,* 241 U. S. 257, 260 (1916))).

Second, although a decree entered by this Court could conceivably afford an additional and separate basis for ordering

---

[1] To the Court, "[i]t seems very clear . . . that Wyoming is seeking a modification of the decree in order to enforce its predicate." *Ante,* at 20, n. 2. I would expect such clarity to show in the language of the Fourth Cross-Claim itself, but the prayer for relief notably fails to include the word "modify" or its synonyms. In this regard, the Fourth Cross-Claim stands in marked contrast to Wyoming's other cross-claims and its counterclaims against Nebraska. Compare App. to Report E–12 (Fourth Cross-Claim's prayer for relief) with *id.,* at E–6, E–7, E–8, E–10, E–11, E–12 (other prayers). Wyoming is not left "hanging" by its failure to seek a modification of the decree as to the United States' compliance with applicable riparian law and with its contracts. *Ante,* at 19–20, n. 2. As I explain *infra,* at 27–28, the State may seek its requested relief in another forum.

the United States to comply with applicable riparian law and with its storage contracts, our 1945 decree in fact does not. That is, we "*anticipated* that the storage [water] supply would 'be left for distribution in accordance with the contracts which govern it,'" *ante*, at 17 (emphasis added) (quoting *Nebraska I*, 325 U. S., at 631), but we did not *mandate* that result. To the contrary, Paragraph VI of the decree states expressly that "[s]torage water shall not be affected by this decree" and that storage water shall be distributed "without interference because of this decree." *Id.*, at 669. Accord, Brief for Wyoming in Response to Exceptions of Nebraska and the United States 19 ("No one asserted [in 1945] a need for the Court affirmatively to require the [Federal Government's] compliance with federal law; such compliance was assumed").

Because Wyoming's Fourth Cross-Claim against the United States therefore involves neither "an application for *enforcement* of rights already recognized in the decree" nor a request for "a *modification* of the decree," *Nebraska II*, *supra*, at 590, I do not understand why the Court chooses to entertain that claim as part of the present proceeding. It is well established that "[w]e seek to exercise our original jurisdiction sparingly and are particularly reluctant to take jurisdiction of a suit where the plaintiff has another adequate forum in which to settle his claim." *United States* v. *Nevada*, 412 U. S. 534, 538 (1973) *(per curiam)*. This particular reluctance applies squarely to "controversies between the United States and a State," of which we have "original *but not exclusive* jurisdiction." 28 U. S. C. § 1251(b)(2) (emphasis added). Thus, in *United States* v. *Nevada*, we declined to exercise jurisdiction over a dispute between those parties about intrastate water rights, noting that such dispute was "within the jurisdiction of the District Court" in Nevada. 412 U. S., at 538. Accord, *id.*, at 539–540 ("Any possible dispute with California with respect to United States water

uses in that State can be settled in the lower federal courts in California . . .").[2]

These principles should be applied here. Although I agree with the Court that the mere existence of pending litigation brought by individual storage contract holders against the United States in the Federal District Court in Wyoming is not dispositive, see *ante,* at 20–21, I see no reason (and the parties offer none) why Wyoming could not institute its own action against the United States in that forum.[3]   Moreover,

---

[2] Our decision in *California* v. *Nevada,* 447 U. S. 125 (1980), is also on point.   There, as here, we exercised our exclusive original jurisdiction over a dispute between two States, but we declined to expand the reference to the Special Master to include borderland ownership and title disputes that "typically will involve only one or the other State and the United States, or perhaps various citizens of those States."   *Id.,* at 133. Instead, we explained, "litigation in other forums seems an entirely appropriate means of resolving whatever questions remain."   *Ibid.*

Subsequent to our decision in *United States* v. *Nevada* in 1973, we have, in the majority of actions by States against the United States or its officers, summarily denied the motion for leave to file a bill of complaint.   See *Georgia* v. *Nixon, President of the United States,* 414 U. S. 810 (1973); *Idaho* v. *Vance, Secretary of State,* 434 U. S. 1031 (1978); *Indiana* v. *United States,* 471 U. S. 1123 (1985); *Michigan* v. *Meese, Attorney General of the United States,* 479 U. S. 1078 (1987); *Mississippi* v. *United States,* 499 U. S. 916 (1991).   Accord, *United States* v. *Florida,* 430 U. S. 140 (1977) *(per curiam)* (denying motion by Florida for leave to file counterclaim).

[3] The reason cannot be, as the Court seems to think, that "Wyoming's claim derives not from rights under individual contracts but from the decree, and the decree can be modified only by this Court."   *Ante,* at 21. As I have explained, the first of these propositions is not correct.   The second is correct, of course, but also irrelevant: Wyoming seeks not a modification of the decree but an injunction directing the United States to comply with applicable riparian law and with its contracts, thereby *obviating* the need for this Court to modify the decree.   Thus, by "[p]utting aside . . . whether another forum might offer relief that, as a practical matter, would mitigate the alleged ill effects of the National Government's contract administration," *ibid.,* the Court actually puts aside the only relief sought by the claim the Court allows to proceed.

As for standing, see *ante,* at 21, I simply repeat the Court's own discussion of this subject.   In brief, Wyoming's standing is predicated

given the number and variety of the other new or amended claims we have approved today, see *ante,* at 11–15—not to mention the issues left unresolved by our 1993 opinion, see *Nebraska II,* 507 U. S., at 596–603—the significant statutory and contractual issues raised by Wyoming's cross-claim against the United States would most likely be resolved in the District Court with far greater dispatch. Indeed, the present round of litigation has dragged on for almost *nine years,* but we are not even beyond the stage of considering amendments to the pleadings.

Finally, although I share the Court's distaste at the prospect of intervention by individual storage contract holders in this original action, see *ante,* at 21–22, I find it just as distasteful unnecessarily to deny private parties the opportunity to participate in a case the disposition of which may impair their interests. By remitting Wyoming's claim to the District Court, we would allow the storage contract holders to participate voluntarily by joinder or intervention, see Fed. Rules Civ. Proc. 20(a) and 24, or to be joined involuntarily in the interest of just adjudication, see Rule 19.

\* \* \*

The Court's decision to entertain Wyoming's Fourth Cross-Claim against the United States departs from our established principles for exercising our original jurisdiction, ignores the relief requested by Wyoming, and needlessly opens the possibility to a reapportionment of the North Platte. In short, it constitutes "a misguided exercise of [our] discretion." *Wyoming* v. *Oklahoma,* 502 U. S. 437, 475 (1992) (THOMAS, J., dissenting). Accordingly, I respectfully dissent from the Court's decision in this regard.

---

upon its allegation that the United States has failed to "adher[e] to beneficial use limitations in administering storage water contracts . . . and that this [failure] has caused or permitted significant injury to Wyoming interests." *Ante,* at 19.